UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

| | |
|---|---|
| MENELICK MCQUILKIN, | : |
| | : |
| Plaintiff, | : **ECF CASE** |
| | : |
| v. | : **21-cv-497 (TJM/DJS)** |
| | : |
| MARK W. BAKER, CHRISTOPHER TEPEDINO, | : **FIRST AMENDED** |
| KEITH R. BUCK, FABIEN M. MEYER, | : **VERIFIED COMPLAINT** |
| SEBASTIAN L. REKUC, SERYNA E. ANCELET, | : |
| CHRISTOPHER DONOVAN, HARRY L. | : |
| GEORGES, AND CORRECTIONAL OFFICER | : |
| JOHN DOE | : |
| | : |
| Defendants. | : |

------------------------------------------------------------------- X

## PRELIMINARY STATEMENT

This is a civil rights action filed by Menelick McQuilkin ("Mr. McQuilkin" or "Plaintiff"), a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), for violations of his constitutional rights as secured by the Eighth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.

2. The Northern District of New York is an appropriate venue under 28 U.S.C. § 1391(b)(2) as the situs of the events giving rise to the claims herein.

## JURY DEMAND

3. Plaintiff demands trial by jury in this action.

## THE PARTIES

**Plaintiff**

4. Mr. McQuilkin was at all times mentioned herein a prisoner in the custody of DOCCS. He is currently confined at Collins Correctional Facility ("Collins") in Collins, New York.

**Defendants**

5. **Seryna E. Ancelet ("Defendant Ancelet")** was a correctional officer at Ulster Correctional Facility at all times relevant to the claims.

6. **Mark W. Baker ("Defendant Baker")** is a correctional officer at Ulster Correctional Facility at all times relevant to the claims.

7. **Keith R. Buck ("Defendant Buck")** was a correctional officer at Ulster Correctional Facility at all times relevant to the claims.[1]

8. **John Doe ("Defendant John Doe")** was a heavyset correctional officer at Ulster Correctional Facility at all times relevant to the claims.

9. **Christopher Donovan ("Defendant Donovan")** was a correctional officer at Ulster Correctional Facility at all times relevant to the claims.

10. **Harry L. Georges ("Defendant Georges")** was a correctional officer at Ulster Correctional Facility at all times relevant to the claims.[2]

11. **Fabien M. Meyer ("Defendant Meyer")** was a correctional officer at Ulster Correctional Facility at all times relevant to the claims.[3]

---

[1] It is possible that Defendant Buck is Defendant John Doe. At this juncture, Plaintiff is not yet in a position to identify Defendant John Doe. Plaintiff reserves his right to amend the pleadings once he is able to identify John Doe.

[2] It is possible that Defendant Georges is Defendant John Doe. At this juncture, Plaintiff is not yet in a position to identify Defendant John Doe. Plaintiff reserves his right to amend the pleadings once he is able to identify John Doe.

[3] It is possible that Defendant Meyer is Defendant John Doe. At this juncture, Plaintiff is not yet in a position to identify Defendant John Doe. Plaintiff reserves his right to amend the pleadings once he is able to identify John Doe.

12. **Sebastian L. Rekuc ("Defendant Rekuc")** was a correctional officer at Ulster Correctional Facility at all times relevant to the claims.[4]

13. **Christopher Tepedino ("Defendant Tepedino")** was a correctional Sergeant at Ulster Correctional Facility at all times relevant to the claims.

## ALLEGATIONS

14. Mr. McQuilkin has been exclusively in the custody of DOCCS since October 2019 and has been housed in a number of correctional facilities.

## ULSTER CORRECTIONAL FACILITY

15. While Mr. McQuilkin was housed at Ulster Correctional Facility ("Ulster") in October 2019, he started to have problems with security staff on his block.

16. Ulster is a medium security level correctional facility that houses inmates in "cubes."

17. A cube is a cement structure with an open doorway. Each cube is separated by a divider.

18. There are four people assigned to each cube, with their bunkbeds separated by a divider.

19. Cubes do not have doors. Instead, occupants can walk in and out of their cubes freely.

20. On October 24, 2019, at around 5:40 a.m., Defendant Ancelet began the morning count and demanded inmates wake up and make their beds.

21. Defendant Ancelet also announced that inmates who wanted to go back to sleep, may do so, after making their bed.

---

[4] It is possible that Defendant Rekuc is Defendant John Doe. At this juncture, Plaintiff is not yet in a position to identify Defendant John Doe. Plaintiff reserves his right to amend the pleadings once he is able to identify John Doe.

3

22. Mr. McQuilkin woke up, made his bed, got dressed, and laid back down on top of his made bed.

23. Mr. McQuilkin was in cube 19, which is very close to Defendant Ancelet's desk.

24. Around 6:30 a.m., Defendant Ancelet did another tour of the housing unit.

25. When Defendant Ancelet passed Mr. McQuilkin's cube, she demanded that Mr. McQuilkin get up, get dressed, and make his bed.

26. Mr. McQuilkin's bed was already made during the initial morning count; he was lying down on top of his made bed.

27. After returning to her desk, Defendant Ancelet again demanded that Mr. McQuilkin get up and make his bed.

28. Moments later, for a third time, Defendant Ancelet approached Mr. McQuilkin's cube and again demanded that he, "get up!"

29. Mr. McQuilkin, however, was awake, dressed, and lying on top of his made bed.

30. For a fourth time, Defendant Ancelet demanded that Mr. McQuilkin get up.

31. Understandably agitated, Mr. McQuilkin asked Defendant Ancelet why she kept insisting that he get up and make his bed.

32. For a fifth time, Defendant Ancelet demanded that Mr. McQuilkin get up.

33. Mr. McQuilkin slowly stood up, and Defendant Ancelet told Mr. McQuilkin that he was going to the Special Housing Unit ("SHU") and proceeded to write him a ticket.

34. To try and settle the confusion, Mr. McQuilkin pointed to other inmates on the housing unit who were also lying on top of their made beds.

35. Instead of engaging with Mr. McQuilkin, Defendant Ancelet told Mr. McQuilkin to "shut the fuck up," repeatedly.

36. Mr. McQuilkin responded to Defendant Ancelet that it must be because she was a racist, and that he was going to file a grievance reflecting these events.

37. Mr. McQuilkin remained in his cube during this interaction.

38. At that moment, Defendant Ancelet activated her Personal Alarm System and told Mr. McQuilkin to get up against the wall.

39. Mr. McQuilkin immediately complied.

40. Once the response team comprised of Defendants Buck, Meyer, Baker, Rekuc, Donovan, Georges, and John Doe arrived, Defendant Ancelet told the officers that Mr. McQuilkin was in her face, threatening her.

41. Defendant Buck immediately put Mr. McQuilkin in handcuffs.

42. Defendants Buck, Meyer, Baker, Rekuc, Donovan, Georges, and John Doe then escorted Mr. McQuilkin to the front of the housing unit, an area called "the front porch."

43. Defendant Baker then began conducting a pat frisk.

44. Mr. McQuilkin was pleading with the officers, repeatedly telling them that Defendant Ancelet was lying about the events that occurred.

45. Defendant Baker then proceeded to slam Mr. McQuilkin against the brick wall.

46. While Defendant Baker repeatedly slammed Mr. McQuilkin against the brick wall, Mr. McQuilkin turned his head towards Defendant Baker to try and speak.

47. Defendant Baker then slammed Mr. McQuilkin's face against the wall with so much force, he broke his jaw.

48. In Defendant Baker's use of force report, he falsely reported that he "used [his] right hand to firmly apply pressure to the center of [inmate's] back. At this time the inmate's face

came in contact with the rough surface of the brick wall causing a slight abrasion to the inmate's right cheek."

49. Mr. McQuilkin continued to plead with the officers, repeatedly telling them that Defendant Ancelet was lying about the events that occurred.

50. While Defendant Baker held Mr. McQuilkin up against the wall, Defendant John Doe repeatedly slapped him in the face.

51. When Defendant Tepedino walked by Mr. McQuilkin being beaten, Mr. McQuilkin plead to speak with him, to which he responded, "I'm busy," and walked away.

52. Defendant John Doe then began repeatedly punching Mr. McQuilkin in his ribs.

53. After the beating subsided, Defendant John Doe poured hot coffee on Mr. McQuilkin's face and said, "Happy belated birthday nigger."

54. McQuilkin's birthday was on October 23, the day before the beating.

55. Moments later, Defendants Tepedino and Donovan escorted Mr. McQuilkin to the SHU.

56. At SHU intake, Sergeant George R. Dowson III filled out a Form 3152, the suicide prevention screening form.

57. Then, a strip search was conducted.

58. Correctional officer Ashli Colon then photographed Mr. McQuilkin to document his injuries.

59. Sergeant Dowson then escorted Mr. McQuilkin from intake to his SHU cell.

60. Sergeant Dowson saw Mr. McQuilkin's condition and asked him whether Defendant John Doe was involved, which Mr. McQuilkin confirmed.

61. Defendant Tepedino then notified medical that an inmate needed medical attention.

62. Defendant Tepedino's report reveals that he was "informed that someone would be there shortly to examine him."

63. Four hours later, at approximately 11:20 a.m., Nurse Sharon Greer examined Mr. McQuilkin in the strip search/intake room.

64. Nurse Greer's report noted redness and abrasions on the right side of Mr. McQuilkin's face.

65. Nurse Greer's report also revealed that Mr. McQuilkin could not open his mouth fully, and noted visible difficulty talking.

66. Nurse Greer reported that the Doctor wanted Mr. McQuilkin to be brought to medical for evaluation and X-Rays.

67. When Mr. McQuilkin was brought his next meal, he realized that he could not even chew the eggs.

## ERRONEOUS REPORTS

68. After the incident, Defendant Ancelet authored a fictitious misbehavior report stating that, after giving Mr. McQuilkin a direct order to get up and make his bed, Mr. McQuilkin refused and yelled, "you're a fucking racist, you're not making anyone else make their beds. Fuck you. I'm not doing shit." Defendant Ancelet continued her false report, stating that she walked back to her desk, where Mr. McQuilkin followed her and yelled, "I'm going to grieve you, you fucking racist. I should jump over this desk right now and stomp you."

69. After the use of force incident, Use of Force ("UOF") and to/from reports were filed by Defendants, Buck, Baker, Meyer, Rekuc, Donovan, Georges, and Tepedino.

70. None of the reports addressed the full extent of physical beating.

71. Instead, the reports falsely stated that Officer Baker "[U]sed his right hand to gain control of inmate McQuickin, [and] in the process of being guided back to the wall, inmate McQuickin's face made contact with the brick wall."

72. In fact, each of these reports were almost identical. They were what is referred to as "two-line" to/froms.

73. A to/from is a memorandum written to a supervisor or the superintendent explaining an incident.

74. The Sergeant in charge of the investigation is responsible for collecting all of the to/from memorandums from all staff involved.

75. Based on these materials, the Sergeant drafts a letter to the Lieutenant in charge.

76. A "two-line" to/from is when officers and supervising staff mimic one another and keep their reports very vague and consistent.

77. In his role as Sergeant, Defendant Tepedino oversaw all housing that day.

78. Defendant Tepedino was charged with monitoring the to/froms and incident reports that are submitted by his staff.

79. In his role as supervisor, Defendant Tepedino signed off on each of these nearly identical to/from memorandums.

80. Defendant Tepedino's own memorandum mimicked the to/froms written by Defendants Buck, Meyer, Baker, Rekuc, Donovan, and Georges'.

81. Defendant Tepedino then submitted a memorandum to Lieutenant Rosado that further mimicked the information set forth in the fabricated, vague to/froms.

82. The use of "two-line" to/froms is prohibited by the Office of Special Investigations.

## MEDICAL TREATMENT

83. On October 25, 2019, the next day, Mr. McQuilkin saw a dentist at Westchester Medical Center.

84. The dentist's X-Rays revealed Mr. McQuilkin had a broken jaw.

85. The same day, the Office of Special Investigation ("OSI") conducted an investigation about the beating that occurred one day prior.

86. The same day, Mr. McQuilkin was transferred to Fishkill Correctional Facility through Downstate Correctional Facility.

87. Due to his condition, Mr. McQuilkin was placed in the Regional Medical Unit ("RMU") at Fishkill Correctional Facility.

88. On November 1, 2019, Mr. McQuilkin returned to Westchester Medical Center and had wires and pins placed in his jaw, which restricted him to a liquid only diet.

89. On November 13, 2019, Mr. McQuilkin's current sentence expired, and he was transferred back to Rikers Island.

90. On November 14, 2019, Mr. McQuilkin was admitted to the infirmary at Rikers Island for observation and pain management.

91. Still, Mr. McQuilkin was being kept on a strict liquid diet.

92. On or about November 25, 2019, Mr. McQuilkin visited Bellevue Hospital where X-Rays were taken, and his jaw was unwired.

93. Even without the wires, the doctors at Bellevue recommended he continue a full liquid diet for another month.

## FIRST CAUSE OF ACTION
### *42 U.S.C. § 1983 - Excessive Force in Violation of the Eighth Amendment*
**(Against Defendants Baker and John Doe in their individual capacities)**

94.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

95.     On October 24, 2019, Defendants Buck, Meyer, Baker, Rekuc, Donovan, Georges, and John Doe responded to Defendant Ancelet's Personal Alarm System.

96.     Defendant Baker then placed Mr. McQuilkin in handcuffs.

97.     Mr. McQuilkin was not resisting, refusing to be removed from the housing unit or otherwise being combative with Defendant Baker.

98.     Instead, Mr. McQuilkin was trying to tell Defendants Baker and John Doe that Defendant Ancelet was lying.

99.     At that point, Defendant Baker slammed Mr. McQuilkin against the brick wall.

100.    Defendant Baker continued to slam Mr. McQuilkin against the wall, with so much force that he broke Mr. McQuilkin's jaw.

101.    While Defendant Baker held Mr. McQuilkin against the wall, Defendant John Doe repeatedly slapped Mr. McQuilkin in the face and told him to "shut the fuck up, every time you talk, I am going to slap you like a dog."

102.    Defendant John Doe then poured hot coffee on Mr. McQuilkin's face and said, "happy belated birthday nigger."

103.    Mr. McQuilkin suffered a broken jaw, facial pain and swelling.

104.    At no point was there a need to apply any more force than necessary to keep Mr. McQuilkin from turning his head; certainly, there was no need to repeatedly slap him, slam him against the brick wall, and pour hot coffee on his face.

105. Not only did Mr. McQuilkin not pose a threat to any of the Defendants, he was also completely restrained in handcuffs and up against the wall. There was no need to apply any force past the initial handcuffing.

## SECOND CAUSE OF ACTION
*42 U.S.C. § 1983 – Eighth Amendment Failure to Intervene*
**(Against Defendant Tepedino in his individual capacity)**

106. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

107. On October 24, 2019, Defendant Tepedino was on duty as Sergeant.

108. In his role as Sergeant, Defendant Tepedino oversees all housing.

109. When Defendant Tepedino walked by Defendants Baker and John Doe beating Mr. McQuilkin, he did not stop to intervene.

110. When Mr. McQuilkin plead to speak with Defendant Tepedino, Defendant Tepedino responded, "I'm busy."

111. Defendant Tepedino had a reasonable opportunity to intervene and prevent or limit the harm to Mr. McQuilkin.

112. Defendant Tepedino failed to intervene and help Mr. McQuilkin; he also failed to accurately report the unlawful actions of Defendants Baker, Buck, Meyer, Rekuc, Donovan, Georges and John Doe.

113. Defendant Tepedino also failed to fulfill his role as supervisor and allowed his staff to submit "two-line" two/froms.

114. Defendant Tepedino then proceeded to submit a false report to his Lieutenant.

### THIRD CAUSE OF ACTION
*42 U.S.C. § 1983 – Eighth Amendment Failure to Intervene*
**(Against Defendant Ancelet in her individual capacity)**

115. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

116. On October 24, 2019, Defendant Ancelet was on desk duty in the housing block.

117. In her role as a correctional officer, Defendant Ancelet conducted the morning count.

118. Mr. McQuilkin was fully dressed, lying on top of his made bed.

119. Defendant Ancelet proceeded to demand that Mr. McQuilkin get up.

120. Defendant Ancelet began provoking Mr. McQuilkin and told him to "shut the fuck up."

121. Defendant Ancelet then pulled her Personal Alarm System.

122. When the response team arrived, Defendant Ancelet falsely reported that Mr. McQuilkin had "gotten in her face and threatened her."

123. Defendant Ancelet had a reasonable opportunity to deescalate the situation and prevent or limit harm to Mr. McQuilkin.

124. Defendant Ancelet witnessed Defendants Baker and John Doe beating Mr. McQuilkin and failed to intervene.

### FOURTH CAUSE OF ACTION
*42 U.S.C. § 1983 – Eighth Amendment Failure to Intervene*
**(Against Defendants Meyer, Buck, Rekuc, Donovan, and Georges in their individual capacities)**

125. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

126. On October 24, 2019, Defendants Buck, Meyer, Baker, Rekuc, Donovan, Georges, and John Doe responded to Defendant Ancelet's Personal Alarm System.

127. Defendants Buck, Meyer, Rekuc, Donovan, and Georges all witnessed Mr. McQuilkin get beaten by Defendants Baker and John Doe and failed to intervene.

128. Defendants Buck, Meyer, Rekuc, Donovan, and Georges had a reasonable opportunity to deescalate the situation and prevent or limit harm to Mr. McQuilkin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief and enter judgment in his favor:

A. Awarding compensatory damages to Plaintiff against all Defendants.

B. Awarding punitive damages against Defendants Baker and John Doe.

C. Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

D. Ordering such other and further relief as the Court may deem just and proper.

Dated: New York, New York
July 17, 2021

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: *Amy Jane Agnew, Esq.*
Bar No. 700639
*Counsel for Plaintiff*
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com

## VERIFICATION OF COMPLAINT

Menelick McQuilkin, Plaintiff in the above-captioned matter, deposes and says the following under penalty of perjury:

1. My counsel, Kara A. Somerstein, Esq., has prepared the Verified Complaint and I received a hard copy to review through U.S. Express Mail.

2. Due to the COVID pandemic, my counsel could not sit with me in person to go over the contents of the Verified Complaint, but my possession of a copy allowed me to fully comprehend and understand the contents.

3. The statements made within the Verified Complaint are true to my own knowledge, or upon information and belief. As to those statements that are based upon information and belief, I believe those statements to be true.

In accordance with 28. U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _____
Menelick McQuilkin, *Plaintiff*

Dated: 4/23, 2021
Collins, New York

## VERIFICATION OF COMPLAINT

Menelick McQuilkin, Plaintiff in the above-captioned matter, deposes and says the following under penalty of perjury:

1. My counsel, Kara A. Somerstein, Esq., has prepared the Verified Complaint and I received a hard copy to review through U.S. Express Mail.

2. Due to the COVID pandemic, my counsel could not sit with me in person to go over the contents of the Verified Complaint, but my possession of a copy allowed me to fully comprehend and understand the contents.

3. The statements made within the Verified Complaint are true to my own knowledge, or upon information and belief. As to those statements that are based upon information and belief, I believe those statements to be true.

In accordance with 28. U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _____
Menelick McQuilkin, *Plaintiff*

Dated: 4/23, 2021
Collins, New York

## VERIFICATION OF COMPLAINT

Menelick McQuilkin, Plaintiff in the above-captioned matter, deposes and says the following under penalty of perjury:

1. My counsel, Kara A. Somerstein, Esq., has prepared the Verified Complaint and I received a hard copy to review through U.S. Express Mail.

2. Due to the COVID pandemic, my counsel could not sit with me in person to go over the contents of the Verified Complaint, but my possession of a copy allowed me to fully comprehend and understand the contents.

3. The statements made within the Verified Complaint are true to my own knowledge, or upon information and belief. As to those statements that are based upon information and belief, I believe those statements to be true.

In accordance with 28. U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _____
Menelick McQuilkin, *Plaintiff*

Dated: 4/23, 2021
Collins, New York